**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LOUIS BURGH, CHRISTOPHER FIGLER, AMANDO MERCADO, and XOCHILT SMITH, individually and on behalf of all others similarly situated, | Lead Case No. 1:26-cv-01133 (RER/PCG) |
| Plaintiffs, | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| v. | |
| ESSILORLUXOTTICA S.A., LUXOTTICA OF AMERICA, INC., ESSILOR OF AMERICA, INC., and ESSILORLUXOTTICA USA INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Louis Burgh, Christopher Figler, Amando Mercado, and Xochilt Smith, individually and on behalf of the Classes defined herein of similarly situated consumers, bring this class action suit for damages and equitable relief against Defendants EssilorLuxottica S.A., Essilor Luxottica USA, Inc., Luxottica of America, Inc., and Essilor of America, Inc. (collectively, "Defendants" or "EssilorLuxottica"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves and the investigation of their counsel, and on information and belief as to all other allegations.

## NATURE OF THE ACTION

1.     EssilorLuxottica designs, manufactures, imports, and sells ophthalmic lenses, eyeglass frames, and sunglasses.

2.     Beginning in February 2025, President Trump issued a series of executive orders invoking the International Emergency Economic Powers Act ("IEEPA") to impose new and

1

significant tariffs ("subject tariffs") on imports from nearly every foreign country, including those from which EssilorLuxottica sources its products.

3.    Following the imposition of the subject tariffs, EssilorLuxottica publicly stated that it would implement price increases across its product lines to manage the financial impact of the subject tariffs. Consistent with these statements, retail prices for EssilorLuxottica products surged across the United States as a result of the tariffs. Plaintiff and the Classes purchased EssilorLuxottica products after these price increases took effect and, as a result, paid higher prices reflecting these tariff-related adjustments ("tariff surcharges").

4.    Along with implementing these tariff surcharges, however, EssilorLuxottica challenged the legality of the subject tariffs in the United States Court of International Trade ("CIT"), seeking to halt the enforcement of the tariff orders and obtain refunds of the duties it paid because of the subject tariffs. *See generally EssilorLuxottica v. U.S. Customs & Border Prot. et al.*, No. 1:25-cv-00310 (Ct. Int'l Trade Nov. 26, 2025).

5.    Because only importers of record can obtain tariff refunds from the government, and because consumers frequently shoulder the ultimate economic burden of previously imposed tariffs through higher retail prices, Defendants' approach results in a structural mismatch between injury and recovery that leaves consumers uncompensated. Put simply, while the importer fronted the tariff-related cost, the consumers ultimately paid it.

6.    In demanding a refund for duties paid because of the subject tariffs, EssilorLuxottica did not acknowledge the consumers to whom EssilorLuxottica had passed on the economic burden of those duties through the tariff surcharges. The case before the Court of International Trade was stayed pending the United States Supreme Court's resolution of *V.O.S. Selections, Inc. v. Trump*, in which businesses challenged the lawfulness of the subject tariffs.

7.    On February 20, 2026, the Supreme Court held that the subject tariffs were unlawful. *Learning Res., Inc. v. Trump*, 607 U.S. ___, Nos. 24-1287, 25-250, 2026 WL 477534, at *13–14 (U.S. Feb. 20, 2026). But the Supreme Court's invalidation of the subject tariffs, does not remedy the harm for the persons who bore the tariff burden—here, EssilorLuxottica's

2

customers—who have no direct recourse in the CIT, where EssilorLuxottica, as importers of record, are positioned to recoup all such duties.

8. Despite seeking an order entitling it to a refund of the duties collected as a result of the subject tariffs, EssilorLuxottica continued to collect and has not refunded the tariff surcharges it collected from consumers. Upon the determination that the subject tariffs were unlawful, giving rise to EssilorLuxottica's right to receive the duties it paid under the unlawful tariff scheme, EssilorLuxottica is likewise obligated to return the corresponding tariff surcharge collected from Plaintiffs and Class members.

9. And despite seeking an order entitling it to a refund of the duties collected as a result of the subject tariffs, EssilorLuxottica continues to collect and have not refunded the tariff surcharges they collected from consumers. Upon the determination that the subject tariffs were unlawful, giving rise to EssilorLuxottica's right to receive the duties they paid under the unlawful tariff scheme, EssilorLuxottica is likewise obligated to return the corresponding tariff surcharge collected from Plaintiffs and Class members. EssilorLuxottica's retention of those surcharges unjustly profits EssilorLuxottica at the expense of consumers.

10. This lawsuit seeks to prevent EssilorLuxottica from obtaining a double recovery. Defendants have made no commitments to return any portion of anticipated tariff refunds to the consumers who ultimately paid such costs.

11. Plaintiffs seek an order requiring Defendants to disgorge and return to Plaintiffs and the Classes all IEEPA-related costs embedded in elevated consumer prices with interest.

12. Plaintiffs and the Classes are entitled to restitution of the tariff-related overcharges they paid or a proportionate share of any tariff refunds Defendants recover, along with interest and attorneys' fees and costs.

13. Accordingly, Plaintiffs, individually and on behalf of the estimated thousands or millions of similarly situated consumers, seek to ensure that their and the proposed Classes' contributions to paying the subject tariffs are returned and to demand appropriate monetary, equitable, injunctive, and declaratory relief.

## PARTIES

### I.    Plaintiffs

14.    Plaintiff Louis Burgh is a New York resident. On October 26, 2025, Burgh purchased Ray-Ban eyeglasses at a LensCrafters retail store in Kingston, New York. On November 26, 2025, Plaintiff Burgh purchased Ray-Ban eyeglasses from eyebuydirect.com. Plaintiff Burgh was charged an increased price for his purchase that included the tariff surcharge that EssilorLuxottica imposed.

15.    Plaintiff Christopher Figler is an Illinois resident. On July 24, 2025, Plaintiff Figler purchased Ray-Ban eyeglasses from a LensCrafters retail store in Arlington Heights, Illinois. Plaintiff Figler was charged an increased price for his purchase that included the tariff surcharge that EssilorLuxottica imposed.

16.    Plaintiff Amando Mercado is a California resident. On April 4, April 19, and July 24, 2025, Plaintiff Mercado purchased Oliver Peoples eyeglasses at an Oliver Peoples retail store in Costa Mesa, California. Plaintiff Mercado was charged an increased price for his purchase that included the tariff surcharge that EssilorLuxottica imposed.

17.    Plaintiff Xochilt Smith is a California resident. On April 29, 2025, Plaintiff Smith purchased Coach eyeglass frames fitted with Transitions lenses at a retail store in Riverside, California. Plaintiff Smith was charged an increased price for these purchases that included the tariff surcharge that EssilorLuxottica imposed.

### II.    Defendants

18.    Defendant EssilorLuxottica S.A. is a joint stock company incorporated under the laws of France, with a registered office in Charenton-Le-Pont, France. EssilorLuxottica S.A. was formed from the 2018 merger of Luxottica Group S.p.A. and Essilor International SAS. Luxottica Group S.p.A. is a corporation organized under the laws of Italy with its principal place of business in Milan, Italy, and an office in the United States in Mason, Ohio. Luxottica Group S.p.A. owns Luxottica U.S. Holdings Corp, online retailer Glasses.com, Oakley, Inc., Alain Mikli, Arnette, Oliver Peoples, Persol, Ray-Ban, Sferoflex, Starck Biotech Paris, and Vogue Eyewear. Essilor

4

International SAS is upon information and belief a French simplified joint-stock company with its principal place of business in Charenton-le-Pont, France. Essilor International SAS owns Essilor of America Holding Company, Inc., Costa Del Mar, Inc., and Transitions Optical, Inc.

19. Defendant EssilorLuxottica USA Inc. is a Delaware corporation with its principal place of business located at 1 W. 37th Street in New York, New York 10018. EssilorLuxottica USA Inc. is the U.S. operating subsidiary for its European parent company EssilorLuxottica S.A.

20. Defendant Luxottica of America, Inc. is an Ohio corporation with its principal place of business located at 4000 Luxottica Place in Mason, Ohio 45040. Luxottica of America, Inc. is owned by Luxottica U.S. Holdings Corp., a Delaware corporation with its principal place of business in Port Washington, New York. Luxottica of America, Inc. owns eyewear retailers LensCrafters, Pearle Vision, Target Optical, and Sunglass Hut (together with Oakley retail stores, Ray-Ban retail stores, glasses.com, framesdirect.com, and For Eyes).

21. Defendant Essilor of America, Inc. is a Delaware corporation with its principal place of business located at 13555 N. Stemmons Freeway in Dallas, Texas 75234. Essilor of America, Inc. is owned by Essilor of America Holding Company, Inc. Upon information and belief, Essilor of America Inc. owns Vision Source, Frames for America, Inc, and EyeBuyDirect.

## JURISDICTION

22. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"), because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 putative members in the proposed class, and at least one Class Member is a citizen of a state different from any Defendant.

23. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged are part of the same case or controversy.

24. The Court has personal jurisdiction over EssilorLuxottica S.A. because it committed the acts alleged herein in New York, regularly conducts business in this District, and

has extensive contacts with this forum, including by selling and shipping its products to consumers in this District.

25. The Court has personal jurisdiction over EssilorLuxottica USA, Inc. because it conducts substantial business in and is headquartered inquired in New York, and ships goods to and from New York regularly.

26. The Court has personal jurisdiction over Luxottica of America, Inc. because it committed the acts alleged herein in New York, regularly conducts business in this District, and has extensive contacts with this forum, including by selling and shipping its products to consumers in this District.

27. The Court has personal jurisdiction over Essilor of America, Inc. because it committed the acts alleged herein in New York, regularly conducts business in this District, and has extensive contacts with this forum, including by selling and shipping its products to consumers in this District.

28. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District and Defendant transacts substantial business in this District.

## FACTUAL ALLEGATIONS

29. EssilorLuxottica is a global vision care, eyewear, and optical technology company that designs, manufactures, imports, and sells ophthalmic lenses, eyeglass frames, and sunglasses.[1] EssilorLuxottica has a sprawling, "vertically integrated business model" that covers the "entire value chain" of the eyewear industry.[2] EssilorLuxottica dominates much of the global optical industry through an enormous portfolio of brands, subsidiaries, manufacturers, insurers, and retail chains.

---

[1] *Our Strategy*, EssilorLuxottica, https://tinyurl.com/4sy2ut3t (last visited June 18, 2026).

[2] *Id.*

30.     EssilorLuxottica owns some of the most well-known eyewear brands including, *inter alia*, Ray-Ban, Oakley, Sferoflex, Vogue Eyewear, Persol, Arnette, Oliver Peoples, Alain Mikli, Starck Biotech Paris, and Costa Del Mar. EssilorLuxottica also holds licenses enabling it to market eyewear under additional brands, such as Coach—for which EssilorLuxottica holds an exclusive license to design, produce, and distribute prescription frames and sunglasses.[3] EssilorLuxottica owns and controls the direct-to-consumer retail and e-commerce outlets for these brands including, *inter alia* Oakley stores, Ray-Ban stores, Oliver Peoples stores, together with oakley.com, ray-ban.com, oliverpeoples.com, persol.com, costadelmar.com, vogue-eyewear.com, and arnette.com.

31.     EssilorLuxottica also owns the largest eyewear retailers and e-commerce outlets in the United States including, *inter alia*, LensCrafters (lenscrafters.com), Pearle Vision (pearlevision.com), Target Optical (targetoptical.com), Vision Source, and Sunglass Hut (sunglasshut.com).

32.     Between these various subsidies, EssilorLuxottica operates over 4,800 physical retail locations in North America, in addition to its e-commerce outlets.[4]

33.     EssilorLuxottica is a vertically integrated operation and, as such, its business model heavily relies on imports. For example, EssilorLuxottica manufactures certain lenses and sunglasses in Thailand and China, and exports some of its premium frames from Europe.[5]

34.     This model has been extremely lucrative for EssilorLuxottica: in fiscal year 2025, its North American revenue was over $12 billion.[6]

---

[3] *EssilorLuxottica and Coach renew global license agreement*, EssilorLuxottica, https://tinyurl.com/mr2va4fp (last visited July 1, 2026).

[4] 2025 Universal Registration Document, EssilorLuxottica at 42, https://tinyurl.com/yz7mhdbe (last visited June 19, 2026, 2026); *Direct To Consumer*, EssilorLuxottica, https://tinyurl.com/2bvj7j6s (last visited June 19, 2026).

[5] Hugo Lhomedet & Alessandro Parodi, *Ray-Ban Maker EssilorLuxottica Confirms Outlook, to Raise US Prices Due to Tariffs*, Reuters (Apr. 23, 2025), https://tinyurl.com/t6echeam.

[6] *Q4 FY 2025 Press Release*, EssilorLuxottica (Feb. 11, 2026), at 10, https://tinyurl.com/mba32sc8.

35.    By their own admission, Defendants are importers of merchandise into the United States subject to the challenged subject tariffs described below.[7]

## I.    President Trump orders a series of tariffs.

36.    Beginning in February 2025, the Trump Administration issued a series of executive orders imposing new tariffs on goods from most foreign countries, pursuant to IEEPA and predicated on a purported national emergency.

37.    On February 1, 2025, President Trump issued three orders directed at Mexico, Canada, and China, collectively referred to as the "Trafficking Tariff Orders."

38.    The executive order directed at Mexico imposed an additional 25 percent tariff on the import of goods from Mexico.[8]

39.    The executive order directed at Canada imposed a 25 percent tariff on the import of goods from Canada, with certain exceptions.[9]

40.    The executive order directed at China imposed an additional 10 percent *ad valorem* tariff on the import of goods from China on top of existing duties.[10] Through a series of amendments to this executive order, President Trump increased the tariff on the import of goods from China to 20%.[11]

41.    On April 2, 2025, President Trump issued a separate order—the "Reciprocal Tariff Order"—declaring U.S. trade deficits a national emergency.[12] The order took effect on April 9,

---

[7] Complaint, *EssilorLuxottica et al v. United States Customs and Border Prot. et al*, No. 1:25-cv-00310 (Ct. Int'l Trade Nov. 26, 2025), Dkt. No. 2.

[8] Exec. Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025).

[9] Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025).

[10] Exec. Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025).

[11] Exec. Order No. 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9277 (Feb. 11, 2025); Exec. Order No. 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025).

[12] Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025).

8

2025, and imposed a 10% baseline tariff on nearly all imports and added higher, country-specific "reciprocal" tariffs on 57 countries ranging from 11% to 50%.[13]

42.    Within days, China imposed its own retaliatory tariffs and President Trump raised the reciprocal tariff on China from 34% to 84%, and, the next day increased it again to from 84% to 125%, while temporarily suspending elevated tariffs for other countries.[14] When combined with the initial trafficking tariff, most Chinese imports faced a minimum 145% tariff.

## II.    EssilorLuxottica charges consumers more because of these tariffs.

43.    Although they may be nominally directed extraterritorially, the increased costs created by the subject tariffs are borne almost entirely by U.S. importers and consumers.[15] Researchers studying recent tariffs estimate that approximately 96% of the tariff cost burden is passed through to American consumers.[16]

44.    While importers must pay the subject tariffs at the border, wholesalers, manufacturers, and retailers all face a choice: whether to absorb the burden of the subject tariffs or to pass that burden on to their customers.[17] In most cases, including in the case of EssilorLuxottica, the burden of tariffs is eventually passed through to U.S. consumers through retail price increases.[18]

45.    In a May 2025 survey of businesses in the New York-New Jersey region conducted by the Federal Reserve Bank of New York, three-quarters of both manufacturing and service businesses facing tariff-induced cost increases reported they passed along at least some of these

---

[13] *Id.*

[14] Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025); Exec. Order No. 14259, *Amendment to Reciprocal Tariffs and Updated Duties As Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15509 (Apr. 14, 2025); Exec. Order No. 14266, *Modifying Reciprocal Tariff Rates To Reflect Trading-Partner Retaliation and Alignment* (Apr. 9, 2025) 90 Fed. Reg. 15625 (Apr. 15, 2025).

[15] Julian Hinz, et al., *America's Own Goal: Who Pays the Tariffs?*, Kiel Inst. for the World Econ. (Jan. 19, 2026), https://tinyurl.com/ypsczz8y.

[16] *Id.*

[17] *Id.* at 7.

[18] *Id.*

higher costs to their customers by raising prices.[19] Among those businesses, 40% of manufacturers reported passing along greater than 75% of the tariff-induced cost to their customers.[20] EssilorLuxottica's actions exemplify this process.

46.    EssilorLuxottica is a major importer, with a significant portion of their American sales attributable to international imports, including sourcing from east Asian countries like China and Thailand, as well as the European Union, where it is based.[21] Because EssilorLuxottica's U.S. operations rely so heavily on imports, it was particularly vulnerable to the subject tariffs.

47.    EssilorLuxottica asserts in its CIT complaint that it paid duties imposed by the subject tariffs on a "continuous basis."[22] To offset these IEEPA duties, EssilorLuxottica admits it passes tariff-induced cost increases on to its consumers ("tariff surcharges").

48.    As early as April 23, 2025, EssilorLuxottica stated that it would pass along the cost of the subject tariffs to its customers. On a Q1 earnings call, EssilorLuxottica Chairman and CEO Francesco Milleri stated the company was "moving toward the price adjustment in the single-digit territory in the United States across the different product lines and across our distribution channels."[23] Because eyewear pricing is already elevated, even single-digit increases translated into meaningful price hikes for consumers.

49.    EssilorLuxottica implemented these measures to "manage the impact of U.S. import duties."[24] By July 2025, EssilorLuxottica confirmed it had already increased prices in the United States by "mid-single digits" but that the "full effect of these adjustments" would be

---

[19] Jaison R. Abel, et al., *Are Businesses Absorbing the Tariffs or Passing Them On to Their Customers?*, Fed. Rsrv. Bank of N.Y. (June 4, 2025), https://tinyurl.com/4sjnwbrp.

[20] *Id.*

[21] *See* Lhomedet & Alessandro Parodi, *supra* note 4.

[22] Complaint at 15, *EssilorLuxottica*, *supra* note 6.

[23] Hugo Lhomedet & Alessandro Parodi, *Ray-Ban Maker EssilorLuxottica Confirms Outlook, to Raise US Prices Due to Tariffs* (Apr. 23, 2025), https://tinyurl.com/5eunrudn.

[24] *Q1 2025 Revenue*, EssilorLuxottica (Apr. 23, 2025), https://tinyurl.com/6m32b896.

reflected in the second half of 2025.[25] EssilorLuxottica expressed that it was continuing to operate in a "volatile environment," referring to the subject tariffs, and would continue to use pricing actions in response to the tariff.[26]

50.     EssilorLuxottica's tariff surcharges are apparent in retail price increases for its products, which closely follow the imposition of the subject tariffs and EssilorLuxottica's public statements. The following examples are reconstructed price histories of EssilorLuxottica's retail prices at Target Optical, one of its retail outlets:[27]

| Oakley OO9208 RADAR® EV PATH® | | | |
|---|---|---|---|
| Oct. 8, 2024 | Jan. 20, 2025 | May 22, 2025 | Feb. 10, 2026 |
| $271 | $271 | $287 | $287 |
| Oakley 0OO9437 | | | |
| | Mar. 20, 2025 | May 16, 2025 | Feb. 10, 2026 |
| | $266 | $283 | $283 |
| Ray-Ban RB8313 Carbon Fibre | | | |
| Sept. 15, 2024 | Mar. 23, 2025 | May 19, 2025 | Feb. 10, 2026 |
| $287 | $287 | $304 | $304 |
| Ray-Ban 0RB3539 | | | |
| July 18, 2024 | Mar. 18, 2025 | May 22, 2025 | Feb. 10, 2026 |
| $186 | $186 | $197 | $197 |

---

[25] Vlad Schepkov, *EssilorLuxottica Adjusts Strategy Amid U.S. Tariffs, Boosts Meta Smartglass Outlook*, Investing.com (July 28, 2025), https://tinyurl.com/2htpp4jh.

[26] *Q2/H1 2025 Results*, EssilorLuxottica (July 28, 2025), https://tinyurl.com/5kfu2nea.

[27] Historical price comparison was performed using the Wayback Machine (web.archive.org). Since collecting this data, the links to these archived webpages have broken. Copies of screenshots reflecting these archived webpages are on file with Plaintiffs' counsel and available upon request.

51.     The historical price of each example product increases by the end of May 2025, contemporaneous with the imposition of the subject tariffs and consistent with EssilorLuxottica's statements that it would increase prices in response to tariffs.

52.     This pattern can be similarly observed at another of EssilorLuxottica's retail stores, FramesDirect. On January 30, 2025, mere days prior to the implementation of the subject tariffs, Ray-Ban RB6335 eyeglasses had a list price of $198 at FramesDirect, whereas, by May 27, 2025, that list price had increased to $210. Other frames increased even more during that time period, such as the RB2132, the list price of which increased from $168 on January 30, 2025 to $231 on May 27, 2025.[28]

53.     EssilorLuxottica applied tariff surcharges like those in the above examples across its products and caused EssilorLuxottica's consumers to pay a higher price for those products. This is especially the case because EssilorLuxottica, as manufacturer, importer, and retailer, has control over every aspect of the pricing for its products.

54.     EssilorLuxottica's decision to raise prices in response to the IEEPA tariffs contributed to its 2025 North America revenue of $14.46 billion which reflects revenue growth over 6% from 2024.[29]

55.     Plaintiffs and each member of the Class purchased one or more of EssilorLuxottica's products through its retail and e-commerce outlets after the subject tariffs were imposed. At that time, Plaintiffs and the Class paid tariff surcharges to EssilorLuxottica.

56.     As a direct result of EssilorLuxottica's tariff surcharges, Plaintiffs and Class Members paid more for EssilorLuxottica goods than they would have absent the unlawful subject tariffs.

---

[28] *Supra* n.27.

[29] *Q4 FY 2025 Press Release*, *supra* note 5.

### III.    EssilorLuxottica Seeks Refunds of Duties Paid.

57.    On November 26, 2025, EssilorLuxottica sued U.S. Customs and Border Protection (CBP) in the CIT seeking declaratory judgment that the IEEPA tariffs are void with respect to EssilorLuxottica, and that CBP lacks authority to impose or collect the subject tariffs, in addition to an order for the United States to refund EssilorLuxottica, with interest, for the tariffs it paid pursuant to the subject tariffs.[30]

58.    In its complaint, EssilorLuxottica makes no mention of the consumers, including Plaintiffs and Class members, who bore the burden of the subject tariffs through a tariff surcharge implemented by EssilorLuxottica.

59.    Nor has EssilorLuxottica stated its intention to return tariff surcharges to consumers if it is issued a refund. Notably, other companies like FedEx have made such assurances to consumers stating that "if refunds are issued to FedEx, we will issue refunds to the shippers and consumers who originally bore those charges."[31] UPS has likewise committed to refunding tariff payments to customers who paid for them, stating that UPS "will request and retrieve IEEPA tariff refunds from CBP on our customers' behalf. . . . After we receive the funds from CBP, we have established a process to issue refunds to the payors."[32]

60.    On February 20, 2026, the Supreme Court of the United States held that the subject tariffs are unlawful because the imposition of such tariffs exceeds President's authority under the IEEPA. *Learning Res.*, 2026 WL 477534, at \*13–14. In so doing, the Supreme Court affirmed the judgment of the Court of Appeals in *V.O.S. Selections, Inc.*, 149 F.4th 1312. Given this unappealable decision, there is now no ambiguity as to the unlawfulness of the subject tariffs. And as Justice Kavanaugh noted in his dissent, "the interim effects of the Court's decision could be substantial," including requiring the United States to "refund billions of dollars to importers who

---

[30] *Id.*

[31] *Navigating U.S. Tariffs and Customs Regulations*, FedEx, https://tinyurl.com/y66sxmxe (last visited Feb. 26, 2026).

[32] IEEPA Tariff Refund Process, UPS, https://tinyurl.com/yc6mx956 (last visited June 4, 2026).

paid the [subject] tariffs, even though some importers may have already passed on costs to consumers or other." *Learning Res., Inc. v. Trump*, 607 U.S. ___, Nos. 24-1287, 25-250, 2026 WL 477534, at *51 (U.S. Feb. 20, 2026) (Kavanaugh, J., dissenting).

61.     On April 17, 2026, following remand, the Court of International Trade directed CBP to (1) liquidate any unliquidated entries that were subject to IEEPA duties without applying those duties, and (2) reliquidate without IEEPA duties any liquidated entries for which liquidation is not yet final. This means CBP must refund all IEEPA duties that were collected.

62.     CBP has also set up a new system called the Consolidated Administration and Processing of Entries (CAPE) tool, which importers can use to submit refund requests. Once a CAPE Declaration is accepted, CBP removes the IEEPA tariff codes from the entry summaries, recalculates duties as if the IEEPA charges were never assessed, and prepares a refund for the difference—with interest included automatically.

63.     The subject tariffs caused the collection of an estimated $170 billion in duties across impacted industries.[33] And as a major U.S. importer, EssilorLuxottica stands to recover substantial refunds.

64.     As Justice Kavanaugh anticipated, EssilorLuxottica sought and is entitled to a refund for tariff payments it has already passed on to consumers. To the extent that EssilorLuxottica is entitled to a refund for its payments of the subject tariffs, Plaintiffs and Class members are entitled to restitution of the tariff surcharge EssilorLuxottica charged them at the time of their purchases. If EssilorLuxottica retains the refund of tariffs that it did not ultimately bear the full expense of in the first place, and which were instead borne by consumers, EssilorLuxottica will receive an unjust windfall of funds that rightfully belong to Plaintiffs and Class members.

65.     If Plaintiffs and Class members had known that EssilorLuxottica would unfairly retain the tariff surcharge EssilorLuxottica imposed on customers despite asserting the subject

---

[33] *US Supreme Court Decision on IEEPA Tariffs Reshapes Trade Authority and Introduces Potential Refund Opportunity*, PWC (Feb. 25, 2025), https://tinyurl.com/4ndf8j23.

tariffs were illegal, they would not have purchased or would have paid less for EssilorLuxottica's products.

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs bring this action individually and on behalf of all others similarly situated (the "Nationwide Class") as a class action pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4). Plaintiffs seek certification of a class initially defined as follows:

> **Nationwide Class:** All individuals in the United States who purchased an EssilorLuxottica product through an EssilorLuxottica retail or e-commerce outlet within the Class Period.

67.     Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4), Plaintiff Burgh brings this action individually and on behalf of the following New York Class initially defined as:

> **New York Subclass:** All individuals in the state of New York who purchased an EssilorLuxottica product through an EssilorLuxottica retail or e-commerce outlet within the Class Period.

68.     Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4), Plaintiff Figler brings this action individually and on behalf of the following Illinois Class initially defined as:

> **Illinois Subclass:** All individuals in the state of Illinois who purchased an EssilorLuxottica product through an EssilorLuxottica retail or e-commerce outlet within the Class Period.

69.     Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4), Plaintiffs Mercado and Smith bring this action individually and on behalf of the following California Class initially defined as:

> **California Subclass:** All individuals in the state of California who purchased an EssilorLuxottica product through an EssilorLuxottica retail or e-commerce outlet within the Class Period.

70.     The Nationwide Class is referred to herein as the "Class," and the New York Class, the Illinois Class, and the California Class are referred to herein as the "Subclasses," unless otherwise stated.

71.     Excluded from the above Class and Subclasses are EssilorLuxottica, including any entity in which EssilorLuxottica has a controlling interest, is a parent or subsidiary, or which is controlled by EssilorLuxottica, as well as the officers, directors, affiliates, legal representatives,

heirs, predecessors, successors, and assigns of EssilorLuxottica. Also excluded are the judges and court personnel in this case and any members of their immediate families.

72. Plaintiffs reserve the right to amend the Class or Subclasses definitions if discovery and further investigation reveal that the Class or Subclasses should be expanded or otherwise modified.

73. The Class Period begins on February 1, 2025, up to the date this action was commenced and continues through the present and the date of judgement. Plaintiffs reserves the right to amend or modify the class definition(s) with greater specificity, by further division into subclasses, and/or by limitation to particular issues. As described below, the Class satisfies the elements of Fed. R. Civ. P. 23(a) and Rule 23(b).

74. **Numerosity.** The Class and Subclass members are so numerous that joinder of each individual class member would be impracticable and unfeasible. EssilorLuxottica operates thousands of retail locations across the United States, sells millions of products monthly, and services millions of customers. Thus, upon information and belief, the proposed Class and Subclasses consist of thousands or millions of EssilorLuxottica customers who made purchases during the Class Period. The customers included in the Class are ascertainable, as the identities can be determined by objective means. The Class and Subclasses are, however, so large that Class and Subclass members cannot be consolidated in one complaint and it, therefore, would be impractical for each to bring suit individually. Plaintiffs do not anticipate any difficulties in managing the action as a class action.

75. **Commonality and Predominance.** There is a well-defined community of interest among the Class and Subclass members and common questions of both law and fact predominate over questions affecting individual members. These common legal and factual questions include, but are not limited to, the following:

      a.     Whether Defendants passed on tariff-related charges onto customers;

      b.     Whether consumers paid increased prices for Defendants' products attributable to the cost of tariffs;

16

c.    The amount to which consumers paid for the costs of tariffs;

d.    Whether Defendants' retention of tariff refunds is unjust without payment;

e.    Whether Defendants acted unfairly or deceptively by charging consumers for tariff-related costs and then retaining any reimbursements of those tariff charges;

f.    Whether Defendants committed unfair practices under consumer statutes when it simultaneously collected consumer tariff pass-throughs while pursuing government refunds without disclosing that arrangement or establishing a consumer refund mechanism;

g.    Whether Plaintiffs and the Class and Subclass Members are entitled to equitable relief, including, but not limited to, restitution as requested in this Complaint;

h.    Whether Defendants' conduct has harmed Plaintiffs and the Class and Subclass members uniformly;

i.    Whether declaratory relief would afford uniform benefits to the Class and Subclasses.

j.    The measure of damages available to Plaintiffs and the Class and Subclass Members for paying increased prices caused by Defendants' tariff surcharges; and

k.    Whether Plaintiffs and the Classes are entitled to restitution, damages, treble damages, or injunctive relief.

76.    **Typicality.** Plaintiffs' claims are typical of those of the Class and Subclass members in that they arise out of the same course of wrongful conduct committed by Defendants, including its inequitable retention of tariff refunds which rightfully belong to Plaintiffs and Class and Subclass Members. Plaintiffs and Class and Subclass Members have experienced the same harm, including loss of a uniform tariff surcharge on their purchases. EssilorLuxottica's tariff surcharges injured Plaintiffs and the Class and Subclass members in the same way and this injury

17

arises from the same practices or course of conduct. The effort Plaintiffs undertake to pursue their own claims will significantly benefit the Class and Subclass Members because of the identical nature of the issues across the Class and Subclasses.

77.    **Adequacy of Representation.** Plaintiffs will continue to fairly and adequately represent and protect the interests of the members of the Class and Subclasses. Plaintiffs share a common interest with the Class members, with respect to the conduct of the Defendants herein and redress of injury. Plaintiffs have suffered an injury-in-fact because of the conduct of the Defendants, as alleged herein. Plaintiffs have retained counsel who are competent and experienced in the prosecution of complex class actions. Plaintiffs and their counsel intend to prosecute this action vigorously and faithfully for the benefit of the Class members. Plaintiffs and Plaintiffs' counsel have no interests contrary to the Class members and will fairly and adequately protect the interests of the Class.

78.    **Rule 23(b)(2) Class Certification is Appropriate.** Plaintiffs seek specific declaratory relief that would provide relief to the entire Class and Subclasses and remedy Class-wide harms. Plaintiff and Class members have been harmed due to a uniform course of conduct. Defendants subjected Plaintiffs and Class members to the same unfair, unlawful, and unfair practices and harmed them in the same manner by retaining tariff refunds that rightfully belonged to Plaintiffs and Class and Subclass Members.

79.    A uniform declaration would benefit the Class as a whole. Plaintiffs seek declaratory relief that would prevent Defendants from unfairly retaining tariff refunds consisting of Plaintiffs' monies and require Defendants to return those monies to Plaintiffs and the Class members.

<u>**CLAIMS FOR RELIEF**</u>

**COUNT I**
**Money Had and Received**
**(On Behalf of Plaintiffs and the Nationwide Class)**

80.    Plaintiffs incorporate by reference the facts alleged above.

81.     Plaintiffs allege this claim individually and on behalf of the proposed Nationwide Class or, in the alternative, on behalf of their respective proposed Subclasses.

82.     Defendants received money from Plaintiffs and from each member of the proposed Class in the form of a tariff surcharge. The Supreme Court has determined that the tariffs were unlawful.

83.     The purpose of Defendants receiving this money through its tariff surcharges was to pay IEEPA-based duties.

84.     The money that Plaintiffs and each member of the proposed class paid as a result of the tariff surcharge rightfully belongs to Plaintiffs and to each member of the proposed Class.

85.     Defendants have not returned the money, nor have they represented that they have any intention of doing so.

86.     The principles of equity and fairness demand that Defendants are obligated to return the money their customers paid as a result of the inflated prices, which Defendants imposed to financially shield themselves from the IEEPA-based tariffs.

87.     Plaintiffs seek all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to him.

**COUNT II**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

88.     Plaintiffs incorporate by reference the facts alleged above.

89.     Plaintiffs allege this claim individually and on behalf of the proposed Nationwide Class or, in the alternative, their respective proposed Subclasses.

90.     As described herein, Defendants charged Plaintiffs and each member of the proposed Class tariff surcharges when they purchased Defendants' products.

91. By collecting these tariff surcharges, Defendants received and knowingly and willingly accepted a direct benefit at Plaintiffs' and Class members' expense. The Supreme Court has determined that the tariffs were unlawful.

92. Defendants had knowledge of, appreciated, and voluntarily accepted this benefit because Defendants (a) intentionally implemented price increases for the stated purpose of recouping IEEPA tariff costs, and (b) retained the proceeds from those increases paid by Plaintiffs and Class members.

93. Defendants are currently litigating against the federal government to recover those same tariff-related costs and duties that Defendants already recouped through the increased prices charged to Plaintiffs and Class members.

94. Allowing Defendants to retain the tariff-related cost recovery collected from Plaintiffs and Class members while also recovering the same costs from the federal government would result in a double recovery to Defendants for the same alleged injury.

95. Equity and good conscience require that Defendants not be permitted to retain the benefit they obtained from Plaintiffs and Class members to the extent that Defendants have been, or will be, made whole for the same tariff-related costs through its litigation recovery.

96. Defendants' retention of the benefit conferred by Plaintiffs and Class members, without providing restitution or disgorgement corresponding to any recovery of the same tariff-related costs from the federal government, would be unjust, inequitable, and contrary to principles of fairness.

97. Plaintiffs and Class members lack an adequate remedy at law to prevent Defendants' unjust enrichment because, absent equitable relief, Defendants will retain amounts collected from Plaintiffs and Class members that duplicate the amounts Defendants have been, or will be, reimbursed through their anticipated litigation recovery for the same tariff-related costs.

98. Accordingly, Plaintiffs and Class members seek restitution and/or disgorgement from Defendants in an amount equal to the tariff-related cost recovery embedded in the prices paid by Plaintiffs and Class members to the extent those same costs are recovered by Defendants from

the federal government, together with pre- and post-judgment interest, and such other and further equitable relief as the Court deems just and proper.

**COUNT III**
**Declaratory Relief, 28 U.S.C. § 2201**
**(On Behalf of Plaintiffs and the Nationwide Class)**

99.     Plaintiffs incorporate by reference the facts alleged above.

100.     Plaintiffs allege this claim individually and on behalf of the proposed Nationwide Class or, in the alternative, their respective proposed Subclasses.

101.     Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

102.     Plaintiffs' claims present an actual controversy as to the rightful ownership of the tariff surcharges paid to Defendants.

103.     Plaintiffs have suffered an injury by having been required to pay Defendants a tariff surcharge because of the subject tariffs on Defendants' product. And Plaintiffs will imminently suffer an injury by Defendants' unlawful retention of the tariff refund.

104.     This Court can exercise its equitable power to enter a declaratory judgment that retention of the tariff surcharges paid by Plaintiffs but refunded to Defendants is unlawful for any of the above reasons.

**COUNT IV**
**Ohio Statute § 1345.02 (Ohio Consumer Sales Practices Act or "OCSPA")**
**(On Behalf of Plaintiffs and the Nationwide Class)**

105.     Plaintiffs incorporate by reference the facts alleged above.

106.     Plaintiffs allege this claim individually and on behalf of the proposed Nationwide Class.

107.     The OCSPA makes unlawful a supplier's "unfair or deceptive act or practice in connection with a consumer transaction . . . whether it occurs before, during, or after the transaction."

21

108.    Defendants are suppliers under the OCSPA and engaged in a consumer transaction through the sale of Defendants' products to consumers, including Plaintiffs and the Class.

109.    In connection with the sale of Defendants' products to consumers including Plaintiffs and the Class, Defendants committed unfair, deceptive, and/or unconscionable acts.

110.    As alleged herein, Defendants' retention of tariff refunds, despite having shifted those costs to consumers via tariff surcharges, is an unfair, deceptive, and/or unconscionable act under the OCSPA. Plaintiffs and the members of the proposed Class paid more than the value they received, and Defendants unlawfully failed to return resulting surplus.

111.    Defendants' unfair, deceptive, and/or unconscionable conduct was a substantial factor and proximate cause of Plaintiffs' and the Class's injuries.

112.    As a result of Defendants' violations of the OCSPA, Plaintiffs and the Class seek all available damages, in addition to reasonable attorneys' fees and costs, and injunctive relief to prevent Defendants from engaging in the unlawful conduct.

**COUNT V**
**New York General Business Law § 349 (NY GBL § 349)**
**(On Behalf of Plaintiff Burgh and the New York Subclass)**

113.    Plaintiff Burgh incorporates by reference the facts alleged above.

114.    NY GBL § 349 declares unlawful "unfair, deceptive, or abusive acts or practices" in any business, trade, or commerce in New York.

115.    Any person who has been injured by reason of any violation of NY GBL § 349 may bring an action in his or her own name to enjoin such unlawful acts or practices, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

116. Defendants engaged in consumer-oriented conduct by marketing and selling their products to consumers, including Plaintiff Burgh and the New York Subclass, through their websites, retail stores, and other retail channels.

117. Defendants' retention of tariff refunds, despite having shifted those costs to consumers via tariff surcharges, is an unfair practice under NY GBL § 349. Consumers paid more than the value they received, and Defendants unlawfully kept the resulting surplus.

118. Plaintiff Burgh and the New York Subclass have been injured because of Defendants' unfair practices, suffering an ascertainable loss by paying more for a product than they otherwise would have but for the tariff surcharge.

119. As a result of Defendants' violations of NY GBL § 349, Plaintiff Burgh and the New York Subclass seek all available damages, including statutory damages, in addition to reasonable attorneys' fees and costs, and injunctive relief to prevent Defendants from engaging in the unlawful conduct.

## COUNT VI
### 815 Ill. Comp. Stat. §§ 505, et seq. (Illinois Consumer Fraud Act or "ICFA")
### (On Behalf of Plaintiff Figler and the Illinois Subclass)

120. Plaintiff Figler incorporates by reference the facts alleged above.

121. Defendants are "persons" as defined by 815 Ill. Comp. Stat. § 505/1(c).

122. Plaintiff Figler and the Illinois Subclass Members are "consumers" as defined by 815 Ill. Comp. Stat. § 505/1(e).

123. Defendants' conduct as described herein was in the conduct of "trade" and/or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

124. 815 Ill. Comp. Stat. § 505/2 declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices" in "the conduct of any trade or commerce" in Illinois.

125. Defendants' retention of tariff refunds despite having shifted those costs to consumers via tariff surcharges is an unfair practice under 815 Ill. Comp. Stat. § 505/2. Consumers paid more than the value they received, and Defendants unlawfully kept the resulting surplus.

126.    Plaintiff Figler and the Illinois Subclass have been injured because of Defendants' unfair practices, suffering an ascertainable loss by paying more for a product than they otherwise would have but for the tariff surcharge.

127.    As a result of Defendants' violations of the ICFA, Plaintiff Figler and the Illinois Subclass seek all available damages, including statutory damages, in addition to reasonable attorneys' fees and costs, and injunctive relief to prevent Defendants from engaging in the unlawful conduct.

## COUNT VII
### Cal. Bus. & Prof. Code §§ 17200, et seq. (California Unfair Competition Law or "UCL")
### (On Behalf of Plaintiffs Mercado and Smith and the California Subclass)

128.    Plaintiffs Mercado and Smith incorporate by reference the facts alleged above.

129.    The California UCL declares unlawful for any person to commit an act of "unfair competition," including "any unlawful unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Civ. Code § 17200. "[U]nfair competition" is interpreted broadly to include acts that violate other laws and may include acts event if not specifically proscribed by some other law.

130.    Defendants engaged in consumer-oriented conduct by marketing and selling their products to California consumers, including Plaintiffs Mercado and Smith and the California Subclass, through their websites, retail stores, and other retail channels.

131.    Plaintiffs Mercado and Smith have suffered injury in fact and have lost money or property as a result of Defendants' conduct within the meaning of Cal. Bus. & Prof. Code § 17204. Specifically, Plaintiffs Mercado and Smith paid increased prices charged by Defendants that were imposed to recoup costs and duties associated with tariffs implemented under IEEPA, thereby losing money in the amount of the overcharges paid.

132.    Plaintiffs Mercado and Smith's economic injury is concrete and particularized, is fairly traceable to Defendants' price increases and related practices, and is redressable through restitution and injunctive relief under the UCL.

24

133.    Defendants have engaged in "unlawful" business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200 by implementing and collecting tariff-related surcharges and/or price increases from Plaintiffs Mercado and Smith and California Subclass members while contemporaneously pursuing litigation against the federal government to recover those same tariff-related costs, creating the prospect and effect of a double recovery.

134.    The Supreme Court's finding that the underlying tariffs were unlawful in *Learning Res., Inc. v. Trump*, 607 U.S. ___, Nos. 24-1287, 25-250, 2026 WL 477534, at *13–14 (U.S. Feb. 20, 2026), renders Defendants' imposition of and failure to return tariff-related surcharges to California consumers to be an unlawful business practice.

135.    Defendants' conduct violates established legal policies prohibiting unjust and duplicative recovery and requiring truthful, non-misleading pricing practices and restitution when a windfall would otherwise result from overlapping recoveries. Defendants' parallel recoupment through increased prices and anticipated recovery through litigation constitutes an unlawful business practice.

136.    Defendants have engaged in "unfair" business acts or practices within the meaning of the Cal. Bus. & Prof. Code § 17200, by: (a) imposing price increases and/or surcharges on Plaintiffs Mercado and Smith and California Subclass members to recoup IEEPA-based tariff costs; (b) pursuing and, on information and belief, being extremely likely to obtain, recovery of those same tariff-related costs from the federal government; and (c) failing to account for, credit, or return to Plaintiffs Mercado and Smith and California Subclass members the amounts previously collected if and when Defendants recover such amounts through litigation in the Court of International Trade.

137.    The gravity of the harm to consumers, including Plaintiffs Mercado and Smith— namely the payment of artificially inflated prices and the risk and likelihood of Defendants' double recovery—outweighs any purported utility of the challenged practices. Less restrictive alternatives were available to Defendants, including disclosing the contingent nature of the tariff-related price

increases, escrowing the tariff-recovery component, or committing to provide automatic credits or refunds upon any litigation recovery.

138. Defendants' practices offend established public policy and are immoral, unethical, oppressive, and substantially injurious to consumers because they shift tariff-related costs to consumers while positioning Defendants to retain both the consumer-funded recoupment and the separate litigation recovery, resulting in a windfall at consumers' expense.

139. Defendants have engaged in "fraudulent" business acts or practices within the meaning of the Cal. Bus. & Prof. Code § 17200, by making representations, omissions, and/or practices likely to deceive reasonable consumers regarding the nature, purpose, and disposition of the tariff-related price increases, including but not limited to:

      a.    Representing, expressly or by implication, that the price increases or surcharges were necessary to cover unavoidable tariff costs without disclosing that Defendants were pursuing litigation to recover those same costs and was extremely likely to prevail;

      b.    Omitting material facts necessary to prevent consumers from being misled, including the likelihood of Defendants' litigation recovery and the absence of any commitment to refund or credit consumers for the tariff-related amounts previously paid; and

      c.    Failing to disclose that continued collection and retention of tariff-related amounts in the face of an anticipated litigation recovery would result in a double recovery to Defendants.

140. A reasonable consumer would be deceived by Defendants' omissions and practices. Plaintiffs Mercado and Smith and California Subclass members were likely to be, and were, misled into paying increased prices under the belief that such increases were necessary and would not result in an unreversed windfall to Defendants.

141. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent acts and practices, Plaintiffs Mercado and Smith and California Subclass members paid increased

prices and suffered economic injury in the form of overcharges and loss of money or property. Plaintiffs Mercado and Smith would not have paid, or would have paid less than, the tariff-related component of the price had Defendants not engaged in the challenged conduct.

142.   Defendants' conduct is ongoing and/or has continuing effects, including the continued retention of tariff-related amounts collected from Plaintiffs Mercado and Smith and California Subclass members and the imminent or likely receipt of duplicative recoveries from litigation proceeds without provision for restitution, credits, or other consumer redress, absent Court intervention.

143.   Plaintiffs Mercado and Smith, individually and on behalf of the California Subclass, seek all relief available under Cal. Bus. & Prof. Code § 17203 and § 17204.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully requests that the Court enter an order:

    a.   Certifying the Class as requested herein;

    b.   Appointing Plaintiffs as Class Representatives and undersigned counsel to represent the Classes;

    c.   Finding that Defendant engaged in the unlawful conduct as alleged herein;

    d.   Granting permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

    e.   Awarding Plaintiffs and Class Members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

    f.   Granting the declaratory relief sought herein;

27

g.     Awarding statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

h.     Ordering disgorgement and restitution of all profits received or retained by Defendants as a result of their unfair acts, omissions, and practices;

i.     Awarding to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

j.     Granting such other relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a jury trial.

Dated: July 2, 2026                     Respectfully submitted,

<u>/s/ Raphael Janove</u>

Raphael Janove (NY Bar No. 361193)
**JANOVE PLLC**
500 7th Avenue, 8th Fl.
New York, NY 10018
Tel: (646) 347-3940
raphael@janove.law

June P. Hoidal (*Pro Hac Vice*)
Charles R. Toomajian (*Pro Hac Vice*)
Michael J. Laird (*Pro Hac Vice*)
Katja D. Lange (*Pro Hac Vice*)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 341-0400
June.Hoidal@zimmreed.com
Charles.Toomajian@zimmreed.com
Michael.Laird@zimmreed.com
Katja.Lange@zimmreed.com

28

Tina Wolfson (NY Bar No. 5436043)
**AHDOOT & WOLFSON, PC**
2600 W. Olive Ave., Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
twolfson@ahdootwolfson.com

Bradley K. King (NY Bar No. 5585336)
**AHDOOT & WOLFSON, PC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel: (917) 336-0171
bking@ahdootwolfson.com

*Attorneys for Plaintiffs and
the Proposed Classes*